# CASE NO. 14-5144

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

**MARK TROXLER**
**Plaintiff-Appellant,**


**vs.**


**WARREN CLINIC, ET AL.,**
**Defendant-Appellee.**



**Appeal from Dismissal with Prejudice and Judgment Entered By**
**The Honorable Terence C. Kern, District Judge**
**U.S. District Court for the Northern District of Oklahoma**
**Case No. 11-CV-00808**

---

## APPELLANT'S BRIEF-IN-CHIEF

---

Jonathan E. Shook, OBA #17343
SHOOK & JOHNSON, P.L.L.C.
7420 S. Yale Ave.
Tulsa, Oklahoma 74136
(918) 293-1122 - *Telephone*
(918) 293-1133 - *Fax*

**ATTORNEY FOR PLAINTIFF-**
**APPELLANT**

**April 13, 2015**

## TABLE OF CONTENTS

I.     JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.     Basis for District Court's Subject-Matter Jurisdiction. . . . . . . . . . . . . . . . 1

      B.     Basis for the Court of Appeals' Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . 1

      C.     Filing Dates Establishing Timeliness of Appeal. . . . . . . . . . . . . . . . . . . . . 1

      D.     Appellant's Assertion that this Appeal is from a Final Order. . . . . . . . . . . 1

II.    STATEMENT OF ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . 1

III.   STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.   STATEMENT OF FACTS RELEVANT TO THE ISSUES
      SUBMITTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V.    SUMMARY OF TROXLER'S ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VI.   ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.     Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.     The False Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      C.     Troxler Sufficiently Alleged a Factually False Claim for Purposes
             of Rule 12(b)(6) and the District Court Erred in Dismissing
             his Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      D.     Troxler Sufficiently Alleged a Legally False Claim for Purposes
             of Rule 12(b)(6) and the District Court Erred in Dismissing
             his Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VII.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VIII. STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . 27

EXHIBIT A -  Copies of all pertinent orders from the district court.[1]

_____

[1]Also provided via electronic submission as a scanned PDF document.

# TABLE OF AUTHORITIES

## Federal Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . 12, 22, 26

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787 (5th Cir. 2011). . . . . . . . . . 13

*In re Villa West Associates*, 146 F.3d 798 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . 24

*Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . 13

*Mobley v. McCormick*, 40 F.3d 337 (10th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Shaw v. AAA Eng'g & Drafting Inc.*, 213 F.3d 519 (10th Cir. 2000). . . . . . . . . . . . . . . . 16

*Shero v. City of Grove, Okla.*, 510 F.3d 1196 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . 12

*Tuttamore v. Lappin*, 429 F. App'x 687 (10th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255 (5th Cir. 2014). . . . . . . . . . . . . 17

*United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*,
543 F.3d 1211 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006). . . . . . 16

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.*,
614 F.3d 1163 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 15, 16, 17

*United States ex rel. Sikkenga v. Regence Bluecross*,
472 F.3d 702 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 23

## Federal Statutes

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

31 U.S.C. § 3729 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

31 U.S.C. § 3729(a)(1).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 19

31 U.S.C. § 3729(a)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

31 U.S.C. § 3730(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15

31 U.S.C. § 3730(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

31 U.S.C. § 3732(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FED.R.CIV.P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 12, 13, 14

FED.R.CIV.P. 8(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Rules, Regulations, and Other Publications**

BLACK'S LAW DICTIONARY 496 (9th ed. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Centers for Medicare and Medicaid Services Medicare Learning Network
Evaluation and Management Services Guide. . . . . . . . . . . . . . . . . . . . . . . . 3, 23, 24, 25

1995 Evaluation and Management Documentation Guidelines.. . . . . . . . . . . . . . . . . 23, 24

1997 Evaluation and Management Documentation Guidelines.. . . . . . . . . . . 12, 22, 23, 24

**STATEMENT OF PRIOR RELATED APPEALS**

There are no prior or related appeals in this case.

## I.    JURISDICTIONAL STATEMENT

### A.    <u>Basis for District Court's Subject-Matter Jurisdiction</u>:

The United States District Court for the Northern District of Oklahoma had original jurisdiction in the case below pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §3732(a) in that Appellant, Mark Troxler ("Troxler"), on behalf of the United States of America, asserted violations of the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §3729 <u>et seq</u>. as amended ("FCA"), against Appellees, Warren Clinic, Inc. (the "Clinic") and the Saint Francis Health System, Inc. ("SFHS") (collectively the "Defendants"). Troxler's *qui tam* claims under the FCA are authorized by 31 U.S.C. §3732(a), which specifically confers original jurisdiction for such claims on federal district courts pursuant to 31 U.S.C. §§3729 and 3730(b).

### B.    <u>Basis for the Court of Appeals' Jurisdiction</u>:

The United States Court of Appeals for the Tenth Circuit has jurisdiction over this matter pursuant to 28 U.S.C. § 1291.

### C.    <u>Filing Dates Establishing Timeliness of Appeal</u>:

On November 5, 2014, Judgment was entered on the district court docket sheet in favor of Appellees in accordance with the Court's Opinion and Order filed November 5, 2014.  Troxler filed his Notice of Appeal on December 1, 2014.

### D.    **Troxler states that this appeal is from a final order or judgment that disposes of all parties' claims.**

## II.    STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the district court erred in finding that pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Troxler's *qui tam* Complaint failed to state a claim upon which relief may be granted.

-1-

## III.    STATEMENT OF THE CASE

Troxler was employed as a physician by the Clinic from March 2010 to February 2011. In relation to his employment with the Clinic, Troxler also held clinical privileges with SFHS. During the term of his employment, it was affirmed to Troxler that Defendants allowed and encouraged its nurses and medical assistants to perform what is known to be uniquely physician work – the taking and recording of a patient's history of present illness ("HPI"). Throughout the term of his employment, Troxler daily witnessed medical assistants obtaining and documenting HPI when the same, according to well-established rule, should have been obtained by physicians or non-physician practitioners ("NPPs"). During the term of Troxler's employment, he learned that Defendants' physicians, NPPs, management, and staff knowingly caused and allowed medical assistants to obtain and record HPI.

Troxler refused to participate in this behavior, and openly questioned the practice. Defendants did not respond favorably to Troxler's expressions of concern. Troxler reviewed patient charts and billing records to confirm that patient HPI was being obtained by non-licensed medical assistants and not physicians or NPPs. He identified and noted from Defendants' records sixty (60) patient encounters where the patient's HPI was obtained by non-licensed medical assistants and not physicians or NPPs in 2010 (and for one or more years prior).

Based on his employment, his knowledge of Defendants' operations, and his review of records, Troxler filed a *qui tam* Complaint under seal on December 30, 2011. Troxler alleged that Defendants caused and allowed unqualified personnel to obtain and record patients' HPI during office visits. He claimed Defendants fraudulently billed Medicare and Medicaid for the work of obtaining and documenting HPI as if it were performed by physicians when, in fact, it was not. He claimed Defendants knowingly submitted records or

statements to the United States Government, the Oklahoma Health Care Authority, and/or their fiscal agents representing that patients received proper medical evaluation by licensed personnel when, in fact, thousands of such patients were not properly evaluated by licensed physicians. He further claimed that Defendants knowingly submitted false records or statements for payment related to the many thousands of patients who did not receive proper medical evaluation. Finally, he claimed that during the period of Defendants' unlawful conduct, they repeatedly and falsely certified their continued compliance with Medicare guidelines.

On April 12, 2013, Defendants filed their Motion to Dismiss.[2] On May 10, 2013, Troxler filed his response in opposition to Defendants' motion[3] and on May 24, 2013, Defendants' filed their reply brief.

On November 5, 2014, U.S. District Judge Terence C. Kern entered an Opinion and Order granting Defendants' motion to dismiss with prejudice pursuant to Federal Rules of Civil Procedure Rule 12(b)(6). As set out in the Opinion and Order, the district court analyzed Troxler's Complaint[4] and rejected any theory of factual falsity based on unqualified personnel obtaining HPI. [Ex. A, Order, pp. 9-10.] The district court found that Troxler's

---

[2]In their related Brief in Support, Defendants attached a copy of the Centers for Medicare and Medicaid Services ("CMS") Medicare Learning Network Evaluation and Management Services Guide as Exhibit A, which included the 1995 and 1997 Documentation Guidelines for Evaluation and Management Services. [Aplt. App. 00057-145.]

[3]Troxler attached several exhibits to his brief in response to Defendants' motion to dismiss in order to further substantiate his allegations that medical necessity of service is the overarching criterion for payment, and it is a CMS rule that HPI be taken and recorded only by a physician or NPP. [Aplt. App. 00176-205.]

[4]In passing on consideration of whether Troxler had satisfied the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, the district court made reference to Relator's First Amended Complaint. There was no First Amended Complaint filed, nor leave granted for the filing of the same. The district court dismissed with prejudice Troxler's original qui tam Complaint. [*See* Aplt. App. 00002-4.]

allegations focused solely on the credentials of the individuals obtaining the HPI, and that Troxler did not contend that the evaluation and management ("E/M") codes used to bill for patient visits were inappropriate. The district court recited that none of the allegations in the Complaint indicate that any required claim forms identify who performed the HPI. Thus, the district court reasoned "Relator here has not alleged that anything on the claim forms was false on its face and has not disputed that the services actually occurred." *Id.*

The district court also found that Troxler had not plausibly alleged that payment was conditioned on compliance with any contract, statute, or regulation requiring physicians' to obtain HPI and, therefore, it dismissed Troxler's false certification claims. [Ex. A, Order, pp. 10-13.]

Accordingly, the district court entered a Judgment in favor of Defendants on November 5, 2014, and dismissed with prejudice Troxler's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

This appeal timely followed.

## IV. STATEMENT OF FACTS RELEVANT TO THE ISSUES SUBMITTED FOR REVIEW

1.     Troxler is a board-certified physician in internal medicine and sports medicine. He received his medical degree from Oklahoma State University College of Osteopathic Medicine in Tulsa. He went on to complete an internship and residency in Internal Medicine at the University of Oklahoma College of Medicine, and also completed a fellowship in Sports medicine at Rutgers University & Jersey Shore University Medical Center in Neptune, New Jersey. Dr. Troxler is currently employed as a physician at a Baylor Health Care System affiliate, Internal Medicine Associates in McKinney, Texas. [Aplt. App. 00151.]

2.     He was formerly employed as a physician by Warren Clinic, Inc. and held

clinical privileges with Saint Francis Health System, Inc. in Tulsa, Oklahoma beginning in March 2010, and ending in February 2011.  [Aplt. App. 00007-8.]

3.     On December 30, 2011, Troxler filed a *qui tam* Complaint under seal.  [Aplt. App. 00006-23.]

4.     He alleged that at the outset of his employment with Defendants, he attended an employer-provided presentation about "Evaluation and Management Coding Guidelines" where he was told that while Warren Clinic doctors were technically supposed to obtain and record the History of Present Illness ("HPI"), the actual practice was to have nurses and medical assistants do it.  Troxler alleged he was told that such practice had been ongoing for the last 3 or 4 years so more patients could be seen.  [Aplt. App. 00013-14 (¶31).]

5.     Troxler alleged that when he questioned the practice and explained that it was against Medicare guidelines, the presenters criticized his medical training and reiterated that things were done differently at Warren Clinic. [Aplt. App. 00014 (¶32).]

6.     Troxler alleged that one of the Warren Clinic presenters later confirmed the correctness of Troxler's understanding as to the Medicare guideline applicable to taking and recording of HPI.  And she also admitted that many medical assistants within the Clinic had been and were obtaining  HPI notwithstanding the Medicare rule. [Aplt. App. 00014-15 (¶¶ 33, 38).]

7.     Troxler alleged that he took steps to comply with the Medicare rule that a physician or non-physician practitioner (NPP) must personally perform the HPI.  He advised the office manager at the clinic location to which he was assigned that a patient's HPI needed to be collected by himself and only himself for all patients he would be seeing.  The office manager did not notify the clinic staff as to Dr. Troxler's instructions/requirements and his

directive about the taking and recording of HPI for the patients he saw went unheeded. [Aplt. App. 00014 (¶34).]

8.    With respect to the referenced Medicare rule, Troxler alleged that reimbursements from Medicare and Oklahoma Medicaid for physician services in an E/M encounter are made only for services that are medically necessary and essential to the diagnosis and treatment of the patient's presenting problem. He explained that in coding for E/M services, which is the basis for reimbursing physician services, the three key components are patient history, physical examination, and medical decisionmaking. And he alleged that because medical necessity is the overarching criterion for Medicare/Medicaid payment, when a physician's documentation fails to support the medical necessity of a selected level of E/M service, then payment for such service is inappropriate.

Further, Troxler alleged that in order to be properly paid by a government payer for physician work in an E/M encounter, a physician must document the performance of the work in the three key components. He alleged that as concerns the "patient history" component of providing E/M services, nurses and/or medical assistants cannot perform or document the HPI, and that a physician or NPP must personally perform the HPI. [Aplt. App. 00010-11, 00013 (¶¶15, 18, 19, 20, 29, 30).]

9.    Troxler further alleged, with respect to the Medicare rule, that during the term of his employment with Defendants, the Medicare Administrative Contractor for Jurisdiction 4, which included Oklahoma, confirmed the HPI-related rule to be "[t]he physician must personally perform the history of present illness. . . ." [Aplt. App. 00010, 00015 (¶¶16, 39).]

10.    Troxler alleged that Defendants had knowledge of the rule at the time of his complaints because Susan Driesel, a coding and quality control manager admitted that it was

against Medicare guidelines to allow medical assistants to collect the HPI. [Aplt. App. 00013-15 (¶¶31-33, 38).]

11.    In his Complaint, Troxler alleged, upon information and belief, that Defendants had adopted the 1997 Evaluation and Management Documentation Guidelines (and he recited an internet link to the Guidelines). [Aplt. App. 00010 (¶17).]

12.    Troxler alleged he complained to senior executives about medical assistants obtaining HPI, and his complaint was disregarded and he was told "to see more patients and start becoming a team player." [Aplt. App. 00014-15 (¶35).]

13.    Troxler alleged that, as his employment proceeded, by September 2010, he had to remind his clinic's office manager that he needed 15 minutes with each patient because he would obtain the HPI. At the time, he reiterated that medical assistants were not allowed to obtain HPI and to the extent such was still happening with his patients, he was opening another note to record the HPI obtained by him. [Aplt. App. 00015 (¶36).]

14.    Troxler alleged that in September 2010 he spoke with the principal Warren Clinic physician at the location to which he was assigned about the Medicare guideline requiring physicians to obtain HPI. Troxler complained that despite his repeated requests the medical assistants were still collecting HPI, but the principal physician disregarded his complaint. [Aplt. App. 00015 (¶37).]

15.    Troxler alleged that during the term of his employment, and at times he was covering for other clinic doctors and seeing their patients, he was repeatedly scolded by the clinic's office manager and medical staff and told he was to allow medical assistants to collect HPI. He was told not to chart the HPI or change any HPI obtained and recorded by the medical assistants. [Aplt. App. 00016 (¶42).]

16.     He further alleged that when he continued to open a new note to document his collection of a patient's HPI, one of the medical assistants specifically advised him, "I have been collecting HPI for Dr. Thomas and Dr. Bolding for the last several years and I don't plan to quit."  [Aplt. App. 00016 (¶42).]

17.     Troxler alleged that, on a daily basis, he witnessed medical assistants obtaining and documenting HPI in lieu of the physicians or NPPs, and he witnessed such throughout the term of his employment.  [Aplt. App. 00015-16 (¶40).]

18.     Troxler alleged he refused to participate in such behavior.  [Aplt. App. 00015-16 (¶41).]

19.     Troxler alleged that based on his employment with Defendants and based on his direct review of patient charts and billing records, he knew that HPI was being obtained by medical assistants and that such services were being billed by Defendants to third-party payors as if the HPI was personally obtained by a physician or NPP.  He alleged that such bills were submitted to Trailblazer[5] for payment with Medicare funds and the Oklahoma Medicaid fiscal agent for payment with Medicaid funds. [Aplt. App. 00016 (¶43).]

20.     Troxler alleged that based on his employment with Defendants and based on his direct review of patient charts and billing records, he could identify sixty (60) Warren Clinic patients (using patient identification numbers to protect patient confidentiality) for whom the HPI was obtained by non-licensed medical assistants and not physicians or NPPs in 2010 (and for one or more years prior).  [Aplt. App. 00016-17 (¶44).]

21.     Troxler alleged, based on his employment with Defendants, and based on his

_____

[5]Trailblazer Health Enterprises, LLC was contracted by the CMS to serve as the Medicare Administrative Contractor ("MAC") for Jurisdiction 4. [Aplt. App. 00010 (¶16).]

knowledge of Defendants' operations and his review of billing records, that Defendants submitted claims for payment in 2010 (and for one or more years prior) to government payers (and non-government payers) for physician services rendered to the sixty 60 patients where the services rendered, in part, were not personally performed by physicians or NPPs, but were instead performed by non-licensed medical assistants. [Aplt. App. 00017 (¶45).]

22.     Troxler alleged that based his direct observations, the statements made to him during the course of his employment, his knowledge of Clinic operations, and his review of patient charts and billing records, the false claims submitted in relation to 60 patients he listed in his *qui tam* Complaint was a representative sample of the fraudulent scheme engaged in by Defendants.  [Aplt. App. 00017-18 (¶46).]

23.     Troxler alleged, based on or each year since at least 2007, Defendants have repeatedly and falsely certified their continued compliance with Medicare guidelines while knowingly rendering services not in compliance with Medicare guidelines and while knowingly submitting false records or statements for payment related to such services rendered. [Aplt. App. 00020 (¶47).]

24.     Troxler alleged that through the acts and scheme set out in his Complaint, the Defendants knowingly presented and/or caused to be presented to Government Payors, including the United States Government and the Oklahoma Health Care Authority, false or fraudulent claims in order to obtain payment through federally funded health insurance programs in violation of 31 U.S.C. §3729(a)(1)(A).  [Aplt. App. 00021 (¶53).]

25.     He alleged that through the acts and scheme set out in his Complaint, which violated 31 U.S.C. §3729 (a)(1)(B), the Defendants knowingly made, used, caused to be made, or caused to be used false records or statements to get Government Payors, including

the United States Government and the Oklahoma Health Care Authority through federally funded health insurance programs, to approve and/or pay false or fraudulent claims.  [Aplt. App. 00021 (¶54).]

26.     Troxler alleged that the Government Payors, including the United States Government and the Oklahoma Health Care Authority, were unaware of the falsity of the claims, records, and statements made or submitted by Defendants, and in reliance on the accuracy of the claims and/or records, paid Defendants for the purported physician evaluation and management services provided to individuals insured by federally funded health insurance programs, including Medicare and Medicaid.  He alleged that such payments to Defendants based on false or fraudulent claims and/or false or fraudulent records would not have been paid if the truth were known, or the amount of such claims would have been downcoded (or reduced) upon knowledge of true and correct records.  [Aplt. App. 00021-22 (¶55).]

27.     On February 26, 2013, the United States filed a *Notice of the United States' Election to Decline Intervention* and the complaint was subsequently unsealed and served on Defendants.  [Aplt. App. 00003 (dkt. #18, #20).]

28.     On April 12, 2013, Defendants filed their Motion to Dismiss and Brief in Support.  [Aplt. App. 00003 (dkt. #24, #25).]

29.     On May 10, 2013, Troxler filed his response in opposition to Defendants' motion to dismiss.  [Aplt. App. 00003 (dkt. #31).]

30.     On May 24, 2013, Defendants' filed their reply brief.  [Aplt. App. 00004 (dkt. #32).]

31.     On November 5, 2014, U.S. District Judge Terence C. Kern entered an Opinion

and Order in the case, and pursuant to the same, the district court entered Judgment in favor of Defendants. [Aplt. App. 00004 (dkt. #42, #43).]

32.     Troxler filed his Notice of Appeal on December 1, 2014. [Aplt. App. 00004 (dkt. #44).]

## V.     SUMMARY OF TROXLER'S ARGUMENT

A.     The district court erred in rejecting Troxler's theory of factual falsity based on unqualified personnel obtaining HPI.

Troxler sufficiently pled a factually false FCA claim. Contrary to the district court's view, the credentials of the individuals taking and recording the HPI matters a great deal. Defendants have nurses and medical assistants doing that which is solely and exclusively physician work – taking and recording HPI – and then Defendants bill the entire encounter based on a level of service purportedly rendered entirely by a physician. But the entire bill is false because the level of service cannot be established without the valid taking of the bill's foundational element – the HPI. Because medical necessity is the overarching criterion for Medicare/Medicaid payment, when a physician's documentation fails to support the medical necessity of a selected level of **physician work**, then payment for such service is inappropriate.

B.     The district court erred in determining that Troxler had not plausibly alleged that payment was conditioned on compliance with any contract, statute, or regulation requiring physician's to obtain HPI and, therefore, dismissing Troxler's false certification claims.

Troxler's *qui tam* Complaint sets forth factual allegations sufficient to allow the factfinder to infer Defendants have falsely certified compliance with a "condition of

-11-

payment" so to receive payment from Medicare funds. Defendants knowingly violated Medicare guidelines, the 1997 Evaluation and Management Documentation Guidelines promulgated by CMS, which make clear that HPI be taken solely by physicians or NPPs, and <u>not</u> by nurses or medical assistants. Without a validly recorded HPI, the billing codes assigned for the totality of the physician/patient encounter are inherently unsupported by medical necessity, and the claims submitted for payment in these instances are claims based on a falsehood. Defendants knowingly presented such claims for payment to the government.

## VI.    ARGUMENT AND AUTHORITIES

### A.    Standard of Review

This Court conducts a *de novo* review of the district court's dismissal under Rule 12(b)(6). Under 12(b)(6), the court reviews for plausibility, i.e., whether enough facts have been pled to state a plausible claim. *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167 (10th Cir. 2010) (citation omitted). Rule 12(b)(6) tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"[P]lausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the [plaintiff has] not nudged [his] claims across the line from conceivable to plausible." *Khalik v. United*

*Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (internal quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

"A pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do. Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (citation omitted). But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Khalik*, 671 F.3d at 1192.

The 12(b)(6) standard does not "require that the complaint include all facts necessary to carry the plaintiff's burden." *Id*. The plausibility standard "does not give district courts license to look behind [a complaint's] allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 803 n.44 (5th Cir. 2011).

"Rule 8(a)'s mandate . . . has been incorporated into the 12(b)(6) inquiry." *Lemmon*, 614 F.3d at 1171. A Rule 8(a) dismissal is reviewed for an abuse of discretion. *Id*. "Under Rule 8, a plaintiff must provide a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Tuttamore v. Lappin*, 429 F. App'x 687, 689 (10th Cir. 2011) (quoting FED. R. CIV. P. 8(a)(2)).

With respect to claims pursuant to the False Claims Act, this Court in *Lemmon* stated, "Rule 9(b) joins with 8(a) to form the general pleading requirements for claims under the FCA." *Id*. The Court in *Lemmon* said:

Rule 9(b) supplements 8(a) in setting forth the pleading requirements under the

-13-

FCA. Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Our pre-*Twombly* cases required plaintiffs pursuing claims under the FCA to plead the "who, what, when, where and how of the alleged [claim]." *Sikkenga,* 472 F.3d at 727. This language has been read to require plaintiffs to identify the time, place, content, and consequences of the fraudulent conduct. *See, e.g., Koch,* 203 F.3d at 1236 (quoting *Lawrence Nat'l Bank v. Edmonds,* 924 F.2d 176, 180 (10th Cir. 1991)). Though *Twombly* and *Iqbal* clarified 9(b)'s requirements, the Rule's purpose remains unaltered. Namely, "to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based . . . . " *Id.* (quoting *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 987 (10th Cir. 1992)); *see also* 5A Wright & Miller § 1298 (collecting cases in support of the proposition that "the most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b) . . . is the determination of how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a responsive pleading."). Thus, claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme. *See, e.g., United States ex rel. Duxbury v. Ortho Biotech Prods.,* 579 F.3d 13, 29 (1st Cir. 2009); *United States ex rel. Lusby v. Rolls-Royce Corp.,* 570 F.3d 849, 854-55 (7th Cir. 2009); *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 190 (5th Cir. 2009).

*Id*. at 1171-72. And as summarized by the Court in *Lemmon,*

The federal rules do not require a plaintiff to provide a factual basis for every allegation. Nor must every allegation, taken in isolation, contain all the necessary information. Rather, to avoid dismissal under Rules 9(b) and 8(a), plaintiffs need only show that, taken as a whole, a complaint entitles them to relief. *See, e.g., Twombly*, 550 U.S. at 554-56, 127 S.Ct. 1955. The complaint must provide enough information to describe a fraudulent scheme to support a plausible inference that false claims were submitted.

*Lemmon*, 614 F.3d at 1173.

The district court's opinion below does not refer to or discuss the *Lemmon* Court's direction. Applying the foregoing principles, Troxler's factual allegations satisfy the pleading requirements of the FCA. Accordingly, the district court erred in dismissing Troxler's claims pursuant to Rule 12(b)(6).

### B.     The False Claims Act

As noted by the district court, "[t]he FCA covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc*., 543 F.3d 1211, 1217 (10th Cir. 2008) (quotation omitted).   Under the FCA's *qui tam* provisions, an individual may sue on behalf of the government.  31 U.S.C. § 3730(b). The government may intervene and take over the individual's case, but when it declines to do so, the individual may proceed with the litigation and share in any recovery with the government.  31 U.S.C. § 3730(d).

Under § 3729(a)(1), civil liability is imposed when a person "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval."   And under § 3729(a)(2), a party is rendered liable for "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

Liability attaches under § 3729(a) "when a government payee submits either a legally or factually false request for payment." *Lemmon*, 614 F.3d at 1168.  Factually false claims involve "a showing that the payee has submitted an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id*. (quoting *Conner*, 543 F.3d at 1217) (internal quotation marks omitted).   Whereas, legally false requests involve a "knowingly false certification of compliance with a regulation or contractual provision as a condition of payment." *Id*. (citing *Conner*, 543 F.3d at 1217).

Moreover, legally false claims can be based upon both express and implied theories. *See id* at 1168-69; *Conner*, 543 F.3d at 1217.  "Claims under an express-false-certification theory arise when a payee 'falsely certifies compliance with a particular statute, regulation

-15-

or contractual term, where compliance is a prerequisite to payment.'" *Lemmon*, 614 F.3d at 1168 (quoting *Conner*, 543 F.3d at 1217). "The payee's 'certification' need not be a literal certification, but can be any false statement that relates to a claim." *Id.* (citing *Conner*, 543 F.3d at 1217; *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006) ("So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach.")). Express-false-certification claims may be brought under any subsection of § 3729(a). *Id.*

By contrast, "claims under an implied-false-certification theory do not require courts to examine a payee's statements to the government." *Id.* Instead, the focus is "on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment." *Id.* at 1168-69 (quoting *Conner*, 543 F.3d at 1218). Thus, in analyzing claims under an implied-false-certification theory, the concern is not whether the payee made an expressly false statement in tandem with the submission of the claim, but instead "whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment." *Id.* at 1169 (citing *Shaw v. AAA Eng'g & Drafting Inc.*, 213 F.3d 519, 532-33 (10th Cir. 2000); *Conner*, 543 F.3d at 1218).

### C.  Troxler Sufficiently Alleged a Factually False Claim for Purposes of Rule 12(b)(6) and the District Court Erred in Dismissing his Complaint

In dismissing Troxler's complaint with respect to a factual falsity theory, the district court said his allegations focused solely on the credentials of the individuals obtaining the HPI, and Troxler did not contend that the E/M codes used to bill for patient visits were

inappropriate. [Ex. A, Order, pp. 8-9.] The district court then reasoned that "[r]elator here has not alleged that anything on the claim forms was false on its face and has not disputed that the services actually occurred." *Id*.

In so doing, the district court seriously misapprehended Troxler's allegations of factual falsity, and it focused almost exclusively on a purportedly unalleged fact[6] rather than the inferences the pleaded facts supported. FCA claims are sufficiently pled so long as they detail the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme. *Lemmon*, 614 F.3d at 1172. Rule 12(b)(6) does not require Troxler to present his best case or even a particularly good case, only to state a plausible claim. *See United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 263 (5th Cir. 2014).

Troxler sufficiently pled a factually false FCA claim. Troxler alleged that reimbursements from Medicare and Oklahoma Medicaid for physician E/M services, which include physician office visits, are made only for services that are medically necessary and essential to the diagnosis and treatment of the patient's presenting problem. He explained that in coding for E/M services, the three key components are patient history, physical examination, and medical decisionmaking. He alleged that because medical necessity is the overarching criterion for Medicare/Medicaid payment, when a physician's documentation fails to support the medical necessity of a selected level of E/M service, then payment for such service is inappropriate. [Fact No. 8.][7]

---

[6]The district court noted that in Relator's Complaint, he did not allege that Defendants failed to obtain or document patients' HPI. [Ex. A, Order, p. 9.]

[7]It is a well-established Medicare requirement that claims for reimbursement submitted by medical care providers are only payable when the claims are for medically necessary care. *See*

-17-

Troxler further alleged that, in order to be properly paid by a government payer for **physician work** in an E/M encounter, a <u>physician</u> must document the performance of the work in the three key components. Troxler claimed that as concerns the "patient history" component of providing E/M services, nurses and/or medical assistants cannot perform or document the HPI, and that a physician or NPP must personally perform the HPI. [Fact No. 8.]

Troxler alleged that during the term of his employment with Defendants, the MAC for Jurisdiction 4, which included Oklahoma, confirmed the HPI-related rule to be "[t]he physician must personally perform the history of present illness. . . ." [Fact No. 9.] And he alleged Defendants had knowledge of the HPI-related rule at the time of his complaints because, at the outset of his employment it was admitted that physicians were supposed to obtain and record the HPI, and because Susan Driesel, a coding and quality control manager later admitted it was against Medicare guidelines to allow medical assistants to collect the HPI. [Fact Nos. 4, 10.]

Troxler alleged that Defendants, with knowledge it was against Medicare guidelines, knowingly caused and allowed medical assistants to obtain and record HPI and that throughout the term of his employment, he daily witnessed such conduct. [Fact No. 17.] He further alleged in his complaint that based on his knowledge of Defendants' operations and his review of billing records, he knew E/M patient encounters, where HPI was obtained by medical assistants, was billed by Defendants to third-party payors, including Trailblazer for payment with Medicare funds and the Oklahoma Medicaid fiscal agent for payment with Medicaid funds, as if the HPI was personally obtained by a physician or NPP. [Fact No. 19.]

_____

*e.g., United States ex rel. Sikkenga v. Regence Bluecross*, 472 F.3d 702, 708 (10th Cir. 2006).

Troxler went on to allege in his complaint that for sixty (60) patients seen in 2010 (or one or more years before) he had firsthand knowledge based on his treatment of the patients and his related review of the patient charts and billing records, the patients had their HPI taken by non-licensed medical assistants instead of a qualified physician or NPP. [Fact No. 20.] And Troxler further alleged that, "based on his employment with Defendants, and based on his knowledge of Defendants' operations and his review of billing records," Defendants submitted claims for payment to a government payer, as well as non-government payers, for physician services rendered to the 60 patients where the services rendered, in part, were not personally performed by physicians or NPPs, but were instead performed by non-licensed medical assistants. [Fact No. 21.]

Troxler alleged that based his direct observations, the statements made to him during the course of his employment, his knowledge of Clinic operations, and his review of patient charts and billing records, the false claims submitted in relation to 60 patients he listed in his *qui tam* Complaint were a representative sample of the fraudulent scheme engaged in by Defendants. [Fact No. 22.] He alleged that through the acts and scheme set out in his Complaint, Defendants knowingly presented and/or caused to be presented to Government Payors, including the United States Government and the Oklahoma Health Care Authority, false or fraudulent claims in order to obtain payment through federally funded health insurance programs in violation of 31 U.S.C. §3729(a)(1)(A). [Fact No. 24.] And he alleged payments to Defendants based on false or fraudulent claims and/or false or fraudulent records would not have been paid if the truth were known, or the amount of such claims would have been downcoded (or reduced) upon knowledge of true and correct records. [Fact No. 26.]

Troxler's Complaint sufficiently alleges what the district court thought missing – the

-19-

submission of claims for payment where the E/M codes used in the claim for payment was false because the services billed for – physician work in taking and recording the HPI – <u>was not done by a physician</u>.  He has alleged enough facts, taken as true, to state a claim that is plausible on its face.

And while the district court did not discuss the materials attached to Troxler's brief in opposition to Defendants' motion to dismiss,[8] those materials confirmed the favorable inferences Troxler is entitled to; namely, that (1) HPI is **physician-only** work; (2) without a properly documented HPI, the medical necessity of service rendered cannot be established; and (3) a claim for payment presented to a Government payor cannot be established without a **physician-recorded** HPI.

The MAC for Jurisdiction 4 during the time of Dr. Troxler's employment, published an interpretative guide in 2010 entitled *Documenting Components of an Established Office E/M Service* (hereinafter "*Documenting Components*") which confirmed the necessity of **physician-conducted** HPI.   [Aplt. App. 00188-205.]   In *Documenting Components*, Trailblazer variously said as follows:

> [I]nformation contained in the history is absolutely necessary to substantiate medical decision-making and medical necessity, not just of the E/M service but of any and all resulting diagnostic and/or therapeutic services reported.  [Aplt. App. 00190.]

> The reason for the visit for every E/M service that is payable by Medicare must be clearly stated or easily inferred in the CC and HPI.  [Aplt. App. 00191.]

> The CC and HPI contextualize the remaining record of the encounter. All other work components for the encounter must relate to the patient's CC or any new problem identified that requires care for the service to be medically reasonable and necessary.  [Aplt. App. 00190.]

---

[8]*See* Aplt. App. 00176-00205.

The absence of the HPI renders . . . record useless for understanding the patient's condition or the necessity for Medicare payment for the service. [Aplt. App. 00191.]

Every level of an E/M service requires an HPI.  [Aplt. App. 00191.]

The bottom line is that without an HPI, the history key component cannot be considered as one of the two key components necessary for coding established office visit services.  In addition, with inadequate history, medical necessity for the visit is absent.  Finally, without history, it is usually impossible to establish medical necessity for related diagnostic testing and therapeutic intervention.  In short, avoiding recording a clinically meaningful HPI severely limits the usefulness of the record for payer purposes . . . .   [Aplt. App. 00192.]

The Trailblazer publication confirms Troxler's allegation, that the necessity of a billed level of E/M service cannot be established without corroborating information recorded in the HPI. [Fact No. 8.]  And, in any event, Troxler's Complaint viewed in the light most favorable to Troxler, must be taken as true.  As alleged in Troxler's Complaint, nurses and medical assistants employed by Defendants obtained and documented the HPI in sixty (60) patient encounters when the HPI was required to be taken and recorded by a physician.  And in those sixty (60) patient encounters, Defendants submitted claims for payment to government payers (and non-government payers) for **physician services** rendered to the sixty (60) patients where the services rendered, in part, were not personally performed by physicians, but were instead performed by non-licensed medical assistants.  [Fact Nos. 20, 21.]

Because every level of E/M service requires HPI, and without a valid **physician-recorded** HPI in the medical record, which is functionally what exists every time an unqualified nurse or medical assistant recorded it, the medical necessity of the claims complained about by Troxler cannot be established.  Without a validly recorded HPI, the billing codes assigned for the totality of the physician/patient encounter are inherently

-21-

unsupported by medical necessity. Defendants' claims for payment based on coding for the totality of a patient encounter are based on the falsehood that the HPI was taken by the physician, when, in fact, was not.

Troxler's *qui tam* Complaint sets forth factual allegations sufficient to allow the factfinder to infer that Defendants are liable for the misconduct alleged, i.e., that Defendants have submitted factually false claims for payment. Troxler alleged and set forth enough factual matter to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The district court erred in dismissing his factual falsity claim.

### D.    Troxler Sufficiently Alleged a Legally False Claim for Purposes of Rule 12(b)(6) and the District Court Erred in Dismissing his Complaint

In dismissing Troxler's complaint with respect to a legal falsity claim, the district court found that Troxler had not plausibly alleged that payment was conditioned on compliance with any contract, statute, or regulation requiring physician's to obtain HPI. [Ex. A, Order, pp. 10-13.] In so doing, the district court improperly drew inferences in favor of Defendants, and improperly required Troxler to prove his allegations at the motion to dismiss stage.

For instance, the district court said Troxler had not identified a specific contract, statute, or regulation that made compliance with any provision regarding the gathering of HPI a prerequisite to payment. [Ex. A, Order, p. 11.] In fact, Troxler alleged that Defendants knowingly violated Medicare guidelines, the 1997 Evaluation and Management Documentation Guidelines promulgated by CMS. And he alleged payments from Medicare and/or Oklahoma Medicaid for physician services in an E/M encounter could only be made for services that were medically necessary. [Fact Nos. 4, 6, 8, 9, 10, 11.] Although Troxler

did not cite to a specific statute or regulation, case law well documents the Medicare requirement that claims for reimbursement submitted by medical care providers are only payable when the claims are for medically necessary care. *See e.g. Sikkenga*, 472 F.3d at 708.

Further, as established by Defendants in their submission to the district court, CMS has issued specific guidelines addressing the documentation necessary from physicians so they may receive payment from Medicare for E/M physician services. [Aplt. App. 00057-145.]  Through the *Evaluation and Management Services Guide* submitted to the district court by Defendants and which the district court considered, CMS has explained that "E/M services refers to visits and consultations furnished by physicians and the following qualified NPPs: nurse practitioners; clinical nurse specialists; certified nurse midwives; and physician assistants." [Aplt. App. 00063.] CMS has confirmed that "clear and concise medical record documentation is critical to providing patients with quality care and it is required in order for providers to receive accurate and timely payment for furnished services." [Aplt. App. 00060.] The CMS *Guide* also refers to and includes the *1995 Documentation Guidelines for Evaluation and Management Services* and the *1997 Documentation Guidelines for Evaluation and Management Services*. [Aplt. App. 00080-95 and 00096-154.]

The two CMS-issued Documentation Guidelines with the *Guide* are clearly directed to physicians with the intention of providing definitions and medical record documentation guidelines about **physician work** in the E/M service context. [Aplt. App. 00081-82; 00099-100 (emphasis added).]

The Documentation Guidelines represent CMS's written explanation of what physicians are required to do with respect to E/M documentation and, in some cases, what

-23-

documentation requirements physicians may delegate to ancillary staff. The only definitive instruction in the Documentation Guidelines regarding ancillary staff taking "patient history"[9] states:

> The ROS and/or PFSH may be recorded by ancillary staff or on a form completed by the patient. To document that the physician reviewed the information, there must be a notation supplementing or confirming the information recorded by others.

[Aplt. App. 00084, 00102.] Thus, CMS through its *Guide* and the Documentation Guidelines, <u>by exception</u>, has explained what physicians are not required to do with respect to documenting "patient history." They are not required to personally record ROS or PFSH. However, <u>the omission</u> of HPI from the specifically described <u>exceptions</u> makes it clear that the recording of HPI <u>cannot</u> be delegated to ancillary staff.

Any other interpretation violates well-established rules of construction. The doctrine of *expressio unius est exclusio alterius*[10] provides that where specific items are listed in a document, any item not so listed is typically thought to be excluded. The fact that only two sub-components of "patient history" are listed by CMS in the Documentation Guidelines as *permissibly recorded by ancillary staff* indicates that it intended for HPI to be taken solely by physicians or NPPs, and <u>not</u> by nurses or medical assistants.

Rather than accept Troxler's allegations as true, the district court stated it wasn't persuaded. But, in any event, it went on to reject any claim of express or implied false

---

[9]The "patient history" component of an E/M encounter is categorized into four sub-components: (1) Chief Complaint ("CC"), (2) History of Present Illness ("HPI"), (3) Past Family and Social History ("PFSH"), and (4) Review of Systems ("ROS"). [Aplt App. 00011, 00083, 00101.]

[10]The phrase is commonly recited as meaning the express mention or inclusion of one thing excludes all others. *See In re Villa West Associates*, 146 F.3d 798, 805 n.6 (10th Cir. 1998).

certification because the *Guide*, whatever else it might require, does not condition payment on perfect compliance with regulations regarding the taking of HPI. [Ex. A, Order, p. 11.] Of course, the district court overlooked Troxler's allegation, as established by case law, that Medicare requires claims for reimbursement submitted by medical care providers only be paid when the claims are for medically necessary care.

And combining Troxler's two principal allegations leads to what apparently the district court could not be persuaded to accept – without a **physician-recorded** HPI in the medical record, the documentation is *ipso facto* insufficient to establish the medical necessity for the **physician services** billed. Indeed, the district court argued the logic of Troxler's claims by positing the scenario that "the nurse or medical assistant performs the HPI for the physician and provides the results to the physician before he examines the patient." In that way, the court theorized, the information was available to the physician as opposed to unavailable, which the district court thought an important point. [Ex. A, Order, p. 12.]

But the "availability" of HPI to the physician wasn't Troxler's point or claim. Whether the HPI is or is not made available to the physician after being taken and recorded by the nurse or medical assistant is not consequential for billing purposes. The very fact it was taken and recorded by the nurse or medical assistant violates the Medicare guidelines because such is uniquely, solely, and always **physician work**.

And so it should be - by guideline, by policy, and by common sense. A physician cannot meaningfully conduct a physical examination and/or make informed medical decisions about a patient without hearing and fully appreciating the patient's symptoms, the evolution of the illness and the present state of the patient's condition including such information as location, quality, severity, duration, timing, context, modifying factors, and

-25-

associated signs and symptoms.

Assuming this information could reliably be gathered by a nurse, provided to the physician, and meaningfully utilized by the physician in examining the patient and/or making informed medical decisions about the patient is like assuming an appellate court can make informed judgments about witness testimony in district court from a paper record and without having observed the witness' attitude, behavior, tone, body movements, facial expressions, or gestures.[11]

Without a validly recorded HPI, the billing codes assigned for the totality of the physician/patient encounter are inherently unsupported by medical necessity. Defendants' claims for payment based on level of service coding as if the physician performed for the totality of the encounter are claims based on a falsehood. Knowingly presenting claims for payment to the government where such bills are predicated on a falsehood is fraud.

Troxler's *qui tam* Complaint sets forth factual allegations sufficient to allow the factfinder to infer Defendants have falsely certified compliance with a "condition of payment" so to receive payment from Medicare funds. Troxler alleged and set forth enough factual matter to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The district court erred in dismissing his legal false certification claim.

## VII.  CONCLUSION

For the foregoing reasons, Appellant, Mark Troxler, respectfully requests that this Court reverse the district court's judgment of dismissal with prejudice in favor of Appellee, and remand this matter back to the district court for further proceedings.

---

[11]Black's Law Dictionary refers to demeanor as "outward appearance or behavior, such as facial expressions, tone of voice, gestures, and the hesitation or readiness to answer questions." BLACK'S LAW DICTIONARY 496 (9th ed. 2009).

## VIII.  STATEMENT REGARDING ORAL ARGUMENT

Appellant does not request oral argument.  However, should the Court find it useful to hear oral argument, Appellant would appreciate the opportunity to address and clarify such issues as the Court requires.

**Respectfully submitted,**

**SHOOK & JOHNSON, P.L.L.C.**

**By:    s/ Jonathan E. Shook**
**Jonathan E. Shook, OBA #17343**
**7420 S. Yale Ave.**
**Tulsa, Oklahoma 74136**
**(918) 293-1122 -** *Telephone*
**(918) 293-1133 -** *Facsimile*
**jshook@shookjohnson.com**

**Attorney for Plaintiff-Appellant,**
**Mark Troxler**

## CERTIFICATE OF COMPLIANCE

As required by Fed.R.App.P. 32(a)(7)(c), I certify that this brief is proportionally-spaced and contains 7,784 words.

I relied on my word processor to obtain the count and it is WordPerfect Office X5 - WP.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

s/ Jonathan E. Shook
Jonathan E. Shook

## CERTIFICATE OF DIGITAL SUBMISSIONS

I hereby certify that on the 13th day of April 2015, I electronically transmitted a true and correct copy of the foregoing document to the Clerk of Court via e-mail to esubmission@ca10.uscourts.gov and to counsel of record:

Barry L. Smith
barry.smith@mcafeetaft.com

M. Richard Mullins
rick.mullins@mcafeetaft.com

Susan E. Walker
susan.walker@mcafeetaft.com

and further certify that (1) all required privacy redactions have been made, and every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk, and (2) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program (Microsoft Security Essentials (2012)) and, according to the program, are free of viruses.

s/ Jonathan E. Shook
Jonathan E. Shook

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to the applicable local rule of the Tenth Circuit Court of Appeals, within 2 business days of the digital submission of the foregoing document, a true and correct copy of Appellant's Brief-in-Chief and Appellant's Appendix will dispatched to a third-party commercial carrier, Federal Express, for delivery to the clerk of the court and sent via U.S. Mail to counsel of record:

Barry L. Smith
M. Richard Mullins
Susan E. Walker
MCAFEE & TAFT, PC
1717 S. Boulder Ave., Suite 900
Tulsa, Oklahoma 74119

s/ Jonathan E. Shook
Jonathan E. Shook